IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 26, 2017 at Knoxville

## STATE OF TENNESSEE v. PAUL AVERY RENO

### Appeal from the Circuit Court for Sequatchie County
### No. 2015-CR-50    Thomas W. Graham, Judge

### No.  M2016-01903-CCA-R3-CD

The Defendant, Paul Avery Reno, pleaded guilty to statutory rape, a Class E felony.  *See* T.C.A. § 39-113-506 (2014).  Pursuant to the plea agreement, the Defendant agreed to a six-year sentence as a Range III offender, with the method and manner of service to be determined by the trial court.  The court ordered him to serve his sentence in confinement.  On appeal, the Defendant contends that the court erred by (1) denying judicial diversion, (2) denying alternative sentencing, and (3) ordering the Defendant to register as a sex offender.  We affirm the judgment of the trial court but remand for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ. joined.

Joshua P. Weiss, Chattanooga, Tennessee, for the appellant, Paul Avery Reno.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; J. Michael Taylor, District Attorney General; and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant was indicted for aggravated statutory rape and solicitation of a minor.  The Defendant pleaded guilty to one count of statutory rape.  The factual basis for the Defendant's plea was set out at the guilty plea hearing as follows:

> [B]etween April 1, 2013, and June 30, 2013, [the Defendant] did sexually penetrate the victim in this case. . . .  She was between the ages of

13 and 18 years old, and actually at the time these events occurred [the Defendant] was 10 years older than the child.

The complaint was made, and not much happened on it. The victim's mother contacted law enforcement. They were able to initiate contact with [the Defendant]. There [were] several text messages exchanged. [The Defendant] made statements consistent with having sexually penetrated the child. [The Defendant] was subsequently arrested by law enforcement. . . . In the course of the interview [the Defendant] did admit that he had sexually penetrated the victim in this case[.]

Upon questioning by the trial court, the prosecutor stated that the victim was age fourteen at the time of the incident. The prosecutor noted that the Defendant was entering a guilty plea with an out-of-range sentence as a Range III offender and that the agreed sentence was six years. The prosecutor also noted that the Defendant was eligible for alternative sentencing and that his release eligibility was 45%. The trial court questioned the Defendant under oath about his understanding of the terms of the plea agreement and his rights to a jury trial, to confront witnesses, to remain silent, to testify, and to appeal. The Defendant stated that the factual basis for the plea was true, that he understood his rights, and that he wished to plead guilty. The court found that the Defendant was competent to plead guilty, that he understood the consequences of pleading guilty, and that he was entering his guilty plea freely, voluntarily, and understandingly.

The presentence report reflected that the Defendant was age forty-three and had an eleventh-grade education. The Defendant's criminal record consisted of convictions for traffic-related offenses. The Defendant submitted the following statement during the presentence investigation: "To be honest with you I don't remember much about it. All I do remember [is that] my aunt passed away and [the victim's] mother gave me a K8 [and] told me it was a nerve pill. That's all I remember." The report noted that the Defendant admitted to Detective Lockhart that he had oral sex and sexual intercourse with the victim. The Defendant reported having had two strokes in 2010 and a stroke and a "light" heart attack in January 2016. He denied taking prescription or illegal drugs and drinking alcohol. The report stated that the Defendant passed a drug screen in May 2016. The Defendant reported suffering from untreated "major depression disorder" and anxiety. He reported having spent two weeks at a mental health facility around the time of his mother's death in 1997 or 1998. The report listed women who were mothers to the Defendant's children, and the Defendant's minor children as follows:

1. K.C.,[1] age thirty-nine, mother to S.C., age twenty-five

---

[1] We identify the non-testifying mothers of the Defendant's children by their initials out of consideration for their privacy.

2. Breanna Baugh, age twenty-six, mother to A.M. [2,3] and S.R., ages six and four

3. B.B., age thirty-three, mother to A.R., age fourteen

4. Terri Diederich, the Defendant's fiancée, age forty-one, mother to B.D.[4], age twelve

5. K.R., the Defendant's wife, age twenty-eight, mother to Ad.R. and R.R.[5], ages three and four

6. S.S., age forty, mother to Z.R., age eight[6]

The report stated that the Defendant did not provide verification of employment, that he reported working for himself "doing demolition services," and that he had stopped working because he had not received payment after a month of work. The Defendant reported working for a construction company as a painter between May 2014 and May 2016. The Defendant reported a child support obligation relative to one of his children, and the report reflects he was behind on his payments. Counsel noted at the sentencing hearing that any arrearage was recent and that the Defendant was having difficulty maintaining employment due to the charges in this case.

At the sentencing hearing, Sequatchie County Sheriff's Detective Jody Lockhart testified that on September 24, 2014, the victim's mother came to the sheriff's department to check on the status of a complaint she had filed on June 6, 2013. Detective Lockhart said that the case had been assigned to different investigators due to personnel changes and that eventually, the case was assigned to him. He said that the complaint alleged that the Defendant had sexual contact with a child. He stated that the victim's mother gave him a cell phone belonging to the victim and that the Defendant had sent the victim text messages. Detective Lockhart said that the Defendant was a friend of the victim's mother and that the victim and her mother identified the Defendant's telephone number as the number from which the text messages came. Detective Lockhart noted that the Defendant also acknowledged the text messages during his police interview, although the Defendant initially denied that the telephone number belonged to him.

Detective Lockhart testified that he obtained permission from the victim and her mother to pose as the victim and to respond to the text messages. He said the messages the Defendant sent to the victim were sexual in nature, and he read two messages aloud that referred to giving and receiving oral sex. He agreed that the messages were sent about one year after the Defendant was alleged to have had sexual intercourse with the victim.

---

[2] It is the policy of this court to refer to minors by their initials.
[3] A.M. was listed as the Defendant's foster child.
[4] B.D. was listed as the Defendant's stepdaughter.
[5] The Defendant disputed paternity of these children.
[6] The Defendant disputed paternity of this child.

Upon examination by the trial court, Detective Lockhart testified that the Defendant visited the victim's family and that he became friendly with the victim. Detective Lockhart denied that the Defendant was an authority figure to the victim.

On cross-examination, Detective Lockhart testified that the deputy who initially investigated the case had been demoted for multiple reasons, including "being inappropriate" with the county mayor, whom the deputy wanted to fight, and another employee. Detective Lockhart said that the deputy filed a formal report about the Defendant but that Detective Lockhart did not know if the deputy investigated further. Detective Lockhart stated that he did not know if the second deputy to receive the case investigated further. Detective Lockhart said that the second deputy was promoted and that when the victim's mother came to the justice center, Detective Lockhart explained the situation and reviewed the file with the victim and her mother. He said that he interviewed the victim, that the interview was not recorded, and that the victim described incidents occurring one year previously in which she and the Defendant engaged in sexual intercourse at his and the victim's houses. The victim told him that the Defendant never threatened her and that she initially told him no, although she described the encounters as consensual. Due to the amount of time that had passed, Detective Lockhart did not order a forensic examination of the victim.

Detective Lockhart testified that he did not interview the victim's mother and that he later asked the victim to return to the sheriff's department because, during Detective Lockhart's text message conversations with the Defendant, the Defendant asked certain questions to which only the victim knew the answers. Detective Lockhart said that the Defendant expressed doubt that he was conversing with the victim. Detective Lockhart stated that he retrieved text messages from the victim's cell phone, although he did not subpoena the victim's or the Defendant's cell phone provider records.

Detective Lockhart testified that during the Defendant's police interview, the Defendant repeatedly denied penetrating the victim, although Detective Lockhart noted that the Defendant "gave signs of deception when he told me no." Detective Lockhart said that during the latter part of the interview, the Defendant admitted to penetrating the victim. Detective Lockhart denied that he or anyone from his office had contacted the victim or her parents after the Defendant entered his guilty plea. Upon examination by the trial court, Detective Lockhart stated that the victim and her family still lived in the area.

Breanna Baugh, the mother of one of the Defendant's children, testified that she had two children, A.M. and S.R. She said that she had previously had a romantic relationship with the Defendant, that S.R. was the Defendant's biological child, and that the Defendant "took responsibility" for A.M., whom the Defendant met when A.M. was three months old. She stated that S.R. was age four, that A.M. was age six, and that both

children lived with the Defendant. She said that the Defendant had a parental relationship with A.M. and treated both children equally.

Upon examination by the trial court, Ms. Baugh testified that her relationship with the Defendant began in August 2010 when she was age nineteen and that it ended in 2013. She said that she had a good relationship with the Defendant and that he did not owe her child support. She stated that she "went through a rough time" years previously, that she surrendered her children into foster care to "get back on track," and that after one year, she and the Defendant agreed that he would have legal custody of both children. She said that the children were never in harm's way but that she thought the stated reason for the custody transfer was neglect "according to the paperwork."

Ms. Baugh testified that she knew the Defendant well, that he was a good person, and that he was caring and dedicated to his children. She said that the Defendant usually worked and that when he was unemployed, he sought work. She stated that she did not live with the Defendant and did not know how many hours per week he worked. She noted that she was aware of a situation in which the Defendant was ordered to pay child support for a child that was not his. She denied that the Defendant was ever violent toward her, drank alcohol, or used drugs. She stated that her initial reaction to the allegations against the Defendant was that they were not true. She said that the behavior described would be out of character for the Defendant and that she knew the Defendant would never do anything to hurt a child. She stated that even after the proceedings in this case, she did not have any hesitation about her children living with and being around the Defendant.

Relative to the manner of service of the Defendant's sentence, Ms. Baugh testified that she did not think prison was "the best thing," that the Defendant was a "decent guy" who cared about his children and his family, and that she did not think the Defendant would "do anything like that to anyone." She did not think it was necessary to place the Defendant on the sex offender registry. She stated that if the Defendant were ordered to register as a sex offender, A.M. could not live with him and would probably have to live with her. She said that the Defendant followed instructions well and that he would abide by the rules of probation.

On cross-examination, Ms. Baugh testified that a decent person would not send text messages to a fourteen-year-old girl soliciting sex. She did not know if a decent person would have sexual intercourse with a fourteen-year-old girl. She acknowledged that the Defendant admitted to Detective Lockhart that he had sexual intercourse with the victim and that he sent the text messages, although she did not believe the encounters with the victim occurred.

Upon examination by the trial court, Ms. Baugh testified that the Defendant was raising her children. She said that she would like to obtain joint custody of the children

in the future, although she had to "meet certain guidelines" and report to court in Hamilton County before that was possible. She stated that she was not aware of the Defendant's having relationships with children or young women.

Ms. Baugh testified that she had previously been convicted of forgery and theft of property, that her convictions had nothing to do with her losing custody of her children, and that she placed her children in foster care because she was not taking her medication. She acknowledged that when she met the Defendant, he was in his late thirties. She said that at the time of the sentencing hearing, the Defendant was married, divorce proceedings were pending, and he also had a fiancée. She stated that A.M. and S.R. lived with the Defendant and his fiancée. Ms. Baugh said that she knew some of the Defendant's previous employers and that the Defendant worked in construction, although she did not know for whom he worked at the time of the hearing. She said that in a meeting, the Defendant's attorney told her about an incident in which the Defendant took a "nerve pill" and did not remember certain events that occurred with a child.

Terri Diederich, the Defendant's fiancée, testified that she lived with the Defendant, A.M., S.R., and her three children. She said that she was a stay-at-home mother, that she did not have family or friends in the area, and that she met the Defendant online. She stated that she and the Defendant had been in a romantic relationship for two years and had cohabitated for one and one-half years. She said that the first time she met the Defendant in person, she was accompanied by her daughter, B.D., who was age twelve at the time of the sentencing hearing. Ms. Diederich stated that she was a widow, that B.D. had never known her father, and that the "connection between my daughter and [the Defendant] clicked right away." She said that the Defendant was a "very good family man," that he was very good with children, and that she and the Defendant had a very good relationship.

Ms. Diederich testified that the Defendant worked as a construction foreman twelve to sixteen hours per day, that he earned eighteen dollars per hour, and that although he was consistently employed, he did not always work for the same company. She stated that the Defendant had previously been laid off or had left jobs because he "always tried to better himself" and find better-paying jobs for his family. She said that the Defendant was married, that he had no contact with his wife, that the Defendant had asked his wife for a divorce, and that the Defendant had "some issues" in obtaining a divorce. She stated that the Defendant's wife had two children by another man after their separation, that the children had the Defendant's surname, and that until the biological father acknowledged paternity of the children, the court would not grant a divorce. Ms. Diederich stated that the Defendant had not been ordered to pay child support for his wife's two children.

Ms. Diederich testified that she intended to marry the Defendant notwithstanding this case. She said that the Defendant told her he had filed for divorce, although she had

not seen the complaint. She denied that the Defendant drank alcohol, took drugs, was violent, or was emotionally abusive. She said that she and the Defendant were "very close" and communicated well. She said that five children, ranging in age from four to twenty, lived in their household and that the Defendant was "an amazing father." She said that the Defendant worked between fifty and sixty hours per week and that he spent his free time helping her and spending time with the children. She stated that she was not concerned about the Defendant's being around B.D. and that she did not believe the victim's allegations.

Ms. Diederich testified that when the Defendant was arrested, she was angry about the accusations and that she was not angry with the Defendant. She said that she had watched the recording of the Defendant's police interview, that the Defendant was "under a lot of pressure" and was asked the same questions repeatedly, and that she did not believe the Defendant's admissions. Relative to the text messages, she stated that the language was not characteristic of the Defendant and that the telephone number was "wrong." Ms. Diederich testified that she was aware the Defendant had admitted in the presentence investigation report to kissing and to touching the victim. She said that the Defendant's aunt had died, that the Defendant went to the victim's mother's house, that he was upset, and that the victim's mother gave the Defendant a nerve pill to calm him. Ms. Diederich stated that he acted under the influence of the medication.

Ms. Diederich testified that it would tear apart her family if the Defendant were sentenced to confinement. She noted that if the Defendant were placed on the sex offender registry, he could not live with B.D. and that the Defendant pleaded guilty to statutory rape because he was concerned about being required to register as a sex offender. Ms. Diederich said that if the Defendant received judicial diversion, it would help him obtain better employment. She said that if the Defendant were sentenced to probation, she would ensure that he completed his obligations, including paying court costs and fines. She stated that the Defendant would pass drug screens and complete counseling. She said that the Defendant did not deserve to go to jail, that the case had caused the Defendant health problems, and that the case had affected the children.

On cross-examination, Ms. Diederich testified that before she met the Defendant, she lived in Graysville and supported herself and her children with her late husband's Social Security death benefit. Ms. Diederich said that the Defendant paid child support to a woman, although he denied paternity of the child, and that when the Defendant asked for a DNA test in court, "[t]hey would not give him one." Ms. Diederich stated that although the Defendant never married the child's mother, he signed the child's birth certificate.

Ms. Diederich testified that the Defendant generally worked but had been laid off and had received unemployment benefits for at least seven weeks before the sentencing hearing. She said that when the Defendant was unemployed, he looked for work and

helped her at home. She stated that when she described the Defendant's work schedule, she referred to a new job he started "a few weeks ago" and that she was unsure of the company's name. She agreed that child support payments had been previously garnished from his unemployment checks.

Ms. Diederich testified that she had no problem with the Defendant's being around B.D. and that she knew sexual contact between the Defendant and the victim occurred after he took a pill. Ms. Diederich stated that the Defendant did not claim to have taken a pill when he sent the text messages. She said that in the Defendant's police interview, Detective Lockhart spoke loudly but in a conversational tone. She agreed that Detective Lockhart never struck the Defendant and that the Defendant admitted he had sexual intercourse with the victim.

On redirect examination, Ms. Diederich testified that prior to the Defendant's period of unemployment, he worked for a construction company and that due to the charges in the present case, the Defendant had difficulty maintaining employment. Upon examination by the trial court, she stated that shortly after the charges were filed, the Defendant was fired. She said that her relationship with the Defendant began in April 2014, that he had been employed for almost their entire relationship, and that she had accompanied the Defendant to a business to file his tax return.

The Defendant testified that he had lived in Hamilton County his entire life, that he had family in the area, and that he had three children who lived in the area. He said that he had a son who was age twenty-four and who lived in Georgia, as well as a daughter who was age fourteen, lived with her mother in Tennessee, and saw the Defendant regularly. He stated that he lived with Ms. Diederich and five children ages four, six, twelve, eighteen, and twenty. He said that he renovated the house in which they lived during a period of unemployment. He stated that due to a pending motion for custody of A.M. and S.R., he had only sixty days to repair the house and that the house passed inspection.

Relative to his work history, the Defendant testified that two years previously, he worked for a "spa company." He said that he next worked for a company that made car parts and that he worked seventy-two to seventy-four hours per week. He stated that he worked for a construction company as a painter for seven months, that he lost his job because he was jailed after his arrest in the present case, and that he regained his job within three weeks of his release. He said that he worked between seventy and eighty hours per week, that he was subsequently laid off due to a lack of work, and that he did "side jobs" and tried to help people. The Defendant said that he began working for a flooring company three weeks before the sentencing hearing and that he had not yet been paid due to an internal problem at the company. When asked by the trial court whether he reported to the Department of Labor and Workforce Development that he was still

seeking work, the Defendant stated that he was seeking factory work because when he did "housework" he generally got "shafted" and was not paid.

Relative to his home life, the Defendant testified that he helped clean the house and spent time with the children. Upon examination by the trial court, the Defendant said that he had custody of A.M. and S.R. and that Ms. Baugh had previous issues with depression. He stated that Ms. Baugh put the children into foster care while he was at work, that a social worker never contacted him, and that he went to court to obtain custody of the children. He said that a social worker "checked everything" with his job and house and that he eventually obtained sole custody of both children. The Defendant stated that he had accepted A.M. as his own and that he treated A.M. the same as S.R.

The Defendant testified that he married K.R. in 2009, that she "went to the clubs," drank, "[slept] around," and used methamphetamine and that they separated six months after they married. He said that K.R. had a subsequent relationship with another man and had two children with the man. He agreed that K.R. was age twenty or twenty-one at the time of their marriage. He said that K.R. filed for divorce, that he received a complaint and signed the papers, and that his lawyer told him he did not have to accompany the lawyer to the court date. The Defendant stated that he and K.R. agreed on "everything" and that the children's father was supposed to have taken a paternity test. The Defendant said, though, that the man refused to take the test and that the court refused to grant the divorce until one of the men took responsibility for the children. The Defendant stated that he wanted the divorce granted, even if he had to pay child support. He denied having signed the birth certificate for either child and owing child support to K.R. The Defendant noted that he did not drink alcohol or use drugs, that he would not have these substances around his children, and that K.R. had "been in trouble" six or seven times because of methamphetamine and other drugs. The Defendant said that he would pass any drug test the court ordered.

Relative to S.S., the Defendant testified that she was his sister's friend, that they had a romantic relationship, and that she became pregnant and told him she had been artificially inseminated. He said she asked him to "sign as the father" and told him that he had paid for the procedure. He stated that he signed the papers and that after the child was born, S.S. revealed that the child was conceived as a result of her infidelity. He said that they separated and that when the child was age four, S.S. applied for child support. He stated that he asked for a paternity test and that he was told he "played and I can pay." The Defendant noted that both of S.S.'s children were biracial and had the same father, whereas the Defendant and S.S. were Caucasian.

The Defendant testified that at the time of the incident with the victim, two of his aunts had died within three months of one another, that "it was just a hard time," that "we[ were] all sitting there," and that the victim's mother gave him a pill called "K8," which she told him would "help your nerves." He said that he told the victim's mother he

did not take pills and that she told him if he did not take the pill he would have "another stroke" like he had earlier in the year. He stated that he took the pill around 7:30 p.m., that he was "in and out," that he remembered kissing the victim and "grabb[ing] her chest," and that he "got up and left and then I was knocking on my aunt's door at . . . 3:00 . . . in the morning."

When asked by the trial court whether he meant that the drug "in some way caused you to have sex," the Defendant responded, "No, I didn't say nothing about sex." The Defendant said that he asked his sisters what K8 was because "they're on anything and everything that you can probably think of" and that his sister told him it was a pain medication stronger than a 30-milligram Roxicodone tablet. The court asked the Defendant whether he claimed the victim fabricated the allegations, even though the Defendant admitted to Detective Lockhart and to the court during his plea that he had sexual intercourse with her. The Defendant responded that he was "just saying . . . what I remember happening," that he did not remember what he told Detective Lockhart, and that he was not denying that the encounter happened, but rather saying that he could not remember it.

The Defendant testified that he previously had a romantic relationship with the victim's mother. He said he also had a relationship with a second relative of the victim, which lasted for twelve and one-half years. He said that he had known the victim since her birth. He stated that he did not generally take pills and that he recently had two strokes, a "light" heart attack, and hypertension. He said that he did not take his prescribed blood pressure medication because he did not like taking pills. He stated that when he thought about the incident with the victim, he felt "[l]ike crap . . . [be]cause that is not me. I'm not that type of person. I have never been that type of person." He said that if he had the opportunity, he would apologize to the victim and to her mother for "everything . . . that was said and . . . done and that . . . I cannot be . . . sorry enough." He stated that he did not remember the substance of his police interview because he was "stressed to the max" about being taken from his family and his job. He said, though, that Detective Lockhart asked him between thirty and forty times whether he had sexual intercourse with the victim and that apart from the last time, the Defendant answered negatively. He stated that he eventually answered affirmatively because he had been interviewed for an hour and "it was just the same thing over and over and over." The Defendant denied sending the victim sexually explicit text messages.

The Defendant testified that an alternative sentence was important for his children and his family because he needed to contribute to the household income to support five children. He stated that if he were placed on the sex offender registry, he would lose his daughter and son, that he would have to move out of his house, and that it would be difficult to work and care for S.R. if he were not able to transport him to and from school. Relative to diversion, the Defendant expressed concern that a criminal record would prevent him from obtaining a job with a livable wage.

-10-

The Defendant testified that he was initially charged with aggravated statutory rape and solicitation of a minor, that the maximum sentences for the charges were four years and two years, respectively, and that he agreed to a six-year sentence out of "gratitude." He said that he was trying to take responsibility for his actions, that he did not "see how I could have let something like that happen," and that he generally tried to be cautious and help people, not hurt them. He stated that talking about the incident was difficult for him. He said that he guaranteed no inappropriate behavior would occur with B.D. and that he considered B.D. to be his child. He stated that he would go to counseling to assure the trial court that he was not a danger to female children. He said that he did not have any prior felonies, that he was not violent, and that he tried to have a good relationship with Ms. Diederich and their children.

The Defendant testified that he would abide by the rules of probation, pass drug screens, attend counseling, and pay court costs and fines. He said that he planned to find stable employment and that he was willing to "start low and . . . work [his] way up." He apologized and acknowledged his actions had hurt many people. He said that his children needed him to be present, and he asked the trial court to allow him to be with his family.

On cross-examination, the Defendant testified that he did not deny any wrongdoing but that he did not remember everything that happened. The Defendant said that he admitted having sexual intercourse with the victim because he was "tired of sitting there," missed his family, and was stressed. He said that he never should have kissed or grabbed the victim. He stated that "[a] whole lot of" the incident occurred because he took a pill. He denied having sent text messages to the victim and telling Detective Lockhart he sent them. He denied "test[ing]" Detective Lockhart in the text messages by asking what the victim said the "first time we were together." The Defendant said the only time he sent the victim a text message was on Facebook, which related to the birth of the victim's niece. The Defendant stated that he pleaded guilty because he knew what he did was wrong and that he was trying to show remorse. When asked whether he was willing to admit having sexual intercourse or sexual contact with the victim, the Defendant said that he "honestly believe[d] I have not because . . . to my knowledge . . . I have not."

The Defendant testified that the victim, the victim's mother, and the victim's mother's boyfriend visited his home on one occasion and that his daughter was present, but that none of them stayed overnight there. He said that he had visited the victim's house previously and that the encounter he remembered occurred there. When the prosecutor commented that the victim said "this happened several times," the Defendant responded, "I've got a son that [says] he has a purple elephant, that [doesn't] mean it's true." The Defendant stated that he did not think he had sexual intercourse with the victim. Relative to the Defendant's "immediately hit[ting] it off" with B.D., the

-11-

Defendant said that they "got along great" and that the Defendant also brought his daughter to their initial meeting.

The Defendant testified that his relationship with Ms. Baugh occurred when she was age twenty and that he married K.R. when she was age twenty or twenty-one. He said that people at the local Department of Labor office told him to bring his first pay stub to them and that although he had been working for three weeks, he had not yet been paid. He denied having been paid in cash. He denied telling the Department of Labor he was working full time, and he said that he worked "side jobs." He agreed that Ms. Diederich testified he worked twelve to sixteen hours per day. He said that he sometimes worked full days and that sometimes he worked only three hours per day.

The trial court noted that the Tennessee Bureau of Investigation report on the Defendant's eligibility for diversion had not yet been received but said it would consider the diversion factors. Relative to the Defendant's amenability to correction, the court found that the Defendant did not have a record of repeated criminal conduct or failure to comply with probation. The court found, though, that it was "disturb[ed]" by the fact that the Defendant's first child was born when the child's mother was age fourteen. The court found that the then-eighteen- to nineteen-year-old Defendant had a sexual relationship with the child's mother when she was age thirteen or fourteen, that the Defendant committed statutory rape relative to K.C., and that the court considered this conduct as part of the Defendant's amenability to change. The court found that the Defendant had "a number of relationships with . . . legal women, but they're always pretty darn young." The court found that K.R. and Ms. Baugh were ages twenty and nineteen, respectively, when they began romantic relationships with the Defendant. The court found that the Defendant was "well over" ten years older than the victim in the present case and that facts of this case supported a conviction for aggravated statutory rape.

The trial court found that based upon the Defendant's admissions, the witnesses' testimony about the admissions, and the victim's account, the encounters with the victim occurred. The court noted that "there's a serious question . . . as to whether or not . . . all these young women that you've been having sex with makes society safer for you to be out there." The court found that the Defendant's amenability to correction was "in doubt."

Relative to the circumstances of the offense, the trial court found that they were "pretty horrendous," and that the facts of the case indicated the victim was "barely 14, possibly 13" when she and the Defendant, who was age forty-two, had sexual intercourse. The court found that this was "a significant circumstance" given that the Defendant pleaded guilty to a lesser offense.

The court found that the Defendant's criminal record was "not all that relevant," although it noted that the Defendant had "some issues" relative to the existence of proof

-12-

he committed statutory rape in the past.  It found that the Defendant's social history was "checkered" due to having relationships with "so many different women" resulting in biological children or children for whom he had accepted parentage.  The court noted that the Defendant had four or five children "that we know of" and that it was "pretty significant for a 42 or three year old man to have these kinds of relationships with children out there . . . that's not the greatest social history[.]"

Relative to the Defendant's employment history, the trial court found that the Defendant had "some positives" and that he had worked "some."  The court discredited the Defendant's testimony "with regard to some of these questions," finding that there existed "serious issues about where the truth lies with regard to your own memory and what you've stated with regard to the events that you accepted in other interviews."  The court found that the Defendant's physical and mental health did not weigh against diversion.  The trial court found that deterrence to the Defendant and others was a "significant issue in this case given the vulnerability of the victim[.]"  The court noted that young girls and women were very vulnerable to "this kind of conduct" and that to grant diversion would be a "free pass or a slap on the wrist" in a case where proof existed of "multiple engagements of sexual conduct with a child 14 or under[.]"

Relative to the interests of the public and the Defendant, the trial court found that society would benefit from denying diversion.  The court noted that it was "scary" that Ms. Diederich, whose child was unrelated to the Defendant and was entering puberty, "absolutely den[ied] the possibility that what you yourself admitted to under oath happened[.]"  The court further noted that B.D. could not defend herself against an adult and that Ms. Diederich, the only adult available to defend her, was "living in a dream world."  The court found that it would not serve the public to "gloss over this."  The court found that almost every factor weighed against granting diversion and declined to grant it.

Relative to probation and alternative sentencing, the trial court considered the contents of the presentence report.  The court found that the report contained some "significantly negative things," including that a twelve-year-old female child not related to the Defendant was living with him, and that it weighed against granting probation.  The court also found that the report stated that the Defendant had "significant" relationships with young women, most of whom were close to but above the age of consent, and that two young women, the victim and K.C., "were clearly not adults when sexual intercourse occurred."  The court found that the Defendant's physical and mental condition were not applicable to the case and did not weigh against granting probation.  Relative to the Defendant's social history, the court found that the Defendant had "peculiar relationships [that] would break off without orders of support or with orders of support which you now say are bogus."  The court noted that the Defendant did not have the "greatest social history[.]"  Relative to the circumstances of the offense and the nature of the conduct involved, the court found that the Defendant had "tak[en] advantage of" a

child who was not old enough to consent to sexual intercourse. The court noted that it was public policy to protect young people and that one could not treat a thirteen or fourteen-year-old child as an adult. The court further noted that a child would be "forever affected by their understanding of what sex is all about. It should be a positive factor dealing with family and so forth, not some kind of situation where a person is just getting gratification from it" and that a child could not appreciate the consequences of sexual intercourse.

Relative to the Defendant's criminal history, the trial court found that it was "not a plus or a minus in this case." Relative to the previous actions and character of the Defendant, the court found that the Defendant's character was at issue and that the Defendant had attempted to deny at the sentencing hearing behavior to which he had previously admitted. The court found that this "argues against the acceptance of whatever punishment we end up here with." Relative to the interests of society and the need to protect society from the Defendant, the court found that the Defendant posed "a risk" to at least one young woman, B.D., with whom he would be in close proximity. The court found that the Defendant had made mistakes with the victim and that the court did not believe B.D. would be protected because Ms. Diederich did not believe it was possible for the Defendant to harm her. Relative to whether the Defendant had recently had measures less restrictive than confinement applied to him, the court found that this factor did not apply.

Relative to whether granting probation would unduly depreciate the seriousness of the offense, the trial court found that the Defendant had committed a "serious offense, it's not just an indiscretion" and that "what really happened" was more serious than the crime to which the Defendant pleaded. Relative to the deterrent value to others, the court found that although people considering whether to violate the law might not know the Defendant's sentence, the conduct was wrong and should be punished. The court denied full probation.

Relative to split confinement, the trial court considered the factors set out in Tennessee Code Annotated section 40-35-103 (2014). The court found that confinement was necessary to protect society from a defendant with a long history of criminal conduct. The court found that the Defendant had a history of relationships with minors, beginning with K.C. and spanning a period of many years. The court also found that the conduct had not stopped, that it had happened repeatedly, and that the Defendant had other relationships "perilously close given the fact that several of these other woman . . . [have] been 10 or 15 or 20 years younger than you even though they might have been over 18. They weren't a whole lot over 18[.]" The court found that it had already reviewed whether confinement was necessary to avoid depreciating the seriousness of the offense in its consideration of whether to grant full probation. The court noted that it believed "this is a significant enough involvement, multiple occasions of intercourse and sexual contact with a child who is barely 14, maybe 13[.]" The court found that any

sentence which included probation would be "against the guidelines." The court found that the factor relative to the recent application of measures less restrictive than confinement did not apply.

The trial court noted that "some innocent people" would be harmed by the Defendant's confinement but that it was not a controlling factor in sentencing. The court further noted that it had "a real problem here because of a pubescent child that's going to have to be living with you." The prosecutor noted that the plea agreement stipulated to a Range III, persistent offender status and that the Defendant had a standard release eligibility of thirty percent.

The prosecutor asked the trial court to make a determination regarding the sex offender registry. The trial court asked if it were possible to set a time limit after which the Defendant would be taken off of the registry, and a probation officer in the courtroom stated that the court could not set a time limit but that after a period of years, the Defendant could petition to be removed from the registry.

Defense counsel argued that the Defendant had taken responsibility, shown remorse, pleaded guilty out of range, and agreed to a longer sentence than he faced at a trial in the hopes that he would not be ordered to register as a sex offender. The trial court commented relative to the length of the sentence that it thought the proof would have resulted in a guilty verdict and that the court would have run the sentences consecutively because they were not a part of the same act. The court stated that it did not think the Defendant had been harmed by the plea agreement. The court noted that the Defendant was "not a particularly strong witness" and that it did not think the Defendant would have been able to testify at a trial without guaranteeing a guilty verdict. The court ordered the Defendant to serve his sentence in confinement and to register as a sex offender. This appeal followed.

# I

## Denial of Diversion

The Defendant contends that the trial court erred in denying judicial diversion, arguing that the court did not consider the *King/Electroplating* factors but rather "merely recite[d]" them. The Defendant requests that this court review the trial court's determination de novo, and he asserts, generally, that the *Electroplating* factors weighed in his favor. The State responds that the court considered each factor and that the Defendant's refusal to accept responsibility for his actions and history of similar conduct justified denying diversion.

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser

-15-

crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense.[7] *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp. 2013) (amended 2014, 2015, 2016). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326 (stating that recent case law affecting the standard of review for sentencing determinations "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion"). "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or lack thereof, is a permissible factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984).

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328.

The record reflects that the trial court weighed each of the *Electroplating* factors, articulated its reasoning, and found nearly every factor weighed against granting diversion. However, the record reflects that the court relied heavily upon improper factors and determinations not supported by the record.

The record reflects that the trial court doubted the Defendant's amenability to correction because he had previously fathered a child with K.C. when she was age fourteen. Based upon this relationship, the court found that the Defendant had previously committed statutory rape and had a "long history" of criminal conduct. The record does not contain sufficient evidence to conclude that the Defendant's relationship with K.C. satisfied the elements of statutory rape. Statutory rape was defined in 1991, the

---

[7] We note that statutory rape is not an enumerated sexual offense for purposes of the diversion statute. *See* T.C.A. § 40-35-313(a)(1)(B)(ii).

approximate year of S.C.'s birth, as the unlawful sexual penetration "of a victim by the defendant . . . when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least four (4) years older than the victim." T.C.A. § 39-13-506(a) (Supp. 1991). The presentence report did not contain proof of K.C.'s birthdate, without which it was impossible for the court to determine whether the Defendant was four years older than K.C. at the time of S.C.'s conception. Therefore, the court did not have sufficient evidence to determine that the Defendant had committed a prior statutory rape, and the court's placing weight on the circumstances of S.C.'s conception as indicative of the Defendant's "long history" of criminal conduct was erroneous.

The trial court also improperly discussed at length and afforded great weight to the Defendant's relationships with younger adult women in the context of his amenability to correction and his social history. The court found that the Defendant's social history was "checkered" due to his previous romantic relationships with younger women, his fathering or being financially responsible for multiple children, his fathering children with multiple women, his disputing the paternity of some of the children, and his being ordered to pay child support for some children but not others. Involvement in nontraditional, consensual relationships with younger adult women, fathering children with those women, disputing paternity of a child, and the absence of child support orders are not unlawful.[8] The court improperly relied upon the Defendant's nontraditional relationships, and its decision to deny diversion was based heavily on its disapproval of the Defendant's lifestyle.

Furthermore, the trial court relied on a need to deter the Defendant from engaging in similar behavior with B.D., whom the Defendant considered to be his daughter, in denying judicial diversion. No psychosexual evaluation was performed in this case, and no evidence was introduced showing that the Defendant generally found teenage girls attractive, that he was attracted to B.D., notwithstanding their family relationship, or that he was likely to reoffend. The trial court's reliance on the Defendant's probability to reoffend in the future was misplaced in the absence of evidence supporting the determination.

Last, the trial court characterized the offense as "horrendous," and it discussed the harm to the victim's "understanding of what sex is all about." Relative to the circumstances of the offense, the Defendant, the forty-two-year-old friend of the victim's mother, pleaded guilty to having sexual intercourse with the fourteen-year-old victim. According to Detective Lockhart, the victim characterized the encounters as consensual, and we note that the period specified in the indictment was three months, indicating that

---

[8] The Defendant reported not being current on his child support obligation to Z.R. in the presentence report. A delinquent child support obligation may have been indicative of a poor social history, but the record reflects that the trial court did not find this as a basis for denying judicial diversion. We note that the Defendant and Ms. Diederich reported the Defendant's difficulty finding work due to the charges in this case.

-17-

the sexual relationship was not excessively prolonged. Although the court properly considered the fact that the Defendant pleaded guilty to a lesser-included offense of the indicted offense, the age gap between the Defendant and the victim alone does not make the circumstances of the offense especially horrendous or shocking, and no evidence of lasting harm to the victim was presented. We note that the victim did not testify at the sentencing hearing, submit a statement to the presentence investigator, or submit a victim impact statement to the trial court. Therefore, we conclude that the case must be remanded for a new sentencing hearing for reconsideration of the trial court's denial of diversion.

As we discuss below, no psychosexual evaluation was conducted in this case. We note that on remand, the trial court may base relevant findings on the contents of a psychosexual evaluation report to the extent that it addresses the court's concerns relative to the public interest and the necessity of deterring the Defendant from similar criminal behavior.

## II

### Denial of Alternative Sentencing

The Defendant contends that the trial court erred by denying his request for alternative sentencing. He offers a host of arguments which may be grouped generally into arguments that (1) the court abused its discretion by "misapplying or failing to consider" the relevant factors, including the Defendant's health, his criminal history, his prior relationships, and mitigating and enhancement factors, and by not finding more factors weighed in the Defendant's favor given the witness testimony, (2) the court erred by ordering full confinement, and (3) the court improperly considered the facts underlying the dismissed solicitation of a minor charge. The State responds that the court considered information relevant to all of the proper factors, that the court explicitly or implicitly discredited the testimony of the Defendant, Ms. Baugh, and Ms. Diederich, that the court properly considered the facts underlying the guilty plea, and that the court did not abuse its discretion by ordering full confinement.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant who otherwise qualifies for probation or alternative sentencing to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2014); *see Trotter*, 201 S.W.3d at 654.

When determining the appropriate sentence, a trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *Ashby*, 823 S.W.2d at 168 (citing T.C.A. §§ 40-35-103 (2014), -210 (2014)); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

As a preliminary matter, the Defendant's contention that the trial court improperly considered "irrelevant" and prejudicial evidence of the text messages the Defendant sent to the victim is without merit. The State correctly states in its brief that a court is permitted to consider evidence of the original facts that lead to a plea agreement. *See State v. Biggs*, 769 S.W.2d 506, 507-508 (Tenn. Crim. App. 1988) ("In considering the circumstances of the offense, the court may go beyond the negotiated plea and consider the 'true nature' of the crime.") (citing *State v. Hollingsworth*, 647 S.W.2d 937, 939 (Tenn. 1983)). Nothing prohibited the court from considering the factual basis of the Defendant's conduct leading to the guilty plea.

However, we conclude that this case must be remanded for a new sentencing hearing. The trial court improperly considered some factors, neglected to consider others, and no psychosexual evaluation was conducted in violation of Tennessee Code Annotated section 39-13-705 (2014) (requiring a psychosexual evaluation when a sex

offender requests alternative sentencing).  As a result, we are unable to determine the Defendant's suitability for alternative sentencing.

The record reflects that the trial court did not consider mitigating or enhancement factors on the record.  The prosecutor noted that he did not think enhancement factors were relevant because the length of the sentence was determined by the plea agreement.  However, enhancement and mitigating factors are also relevant to determinations relative to alternative sentencing.  *See State v. Ring*, 56 S.W.3d 577, 583-84 (Tenn. Crim. App. 2001).  If no applicable mitigating and enhancement factors exist, the court must state this finding on the record.  *State v. Ealey*, 959 S.W.2d 605, 613 (Tenn. Crim. App. 1997).

The record reflects that although the trial court considered most of the required factors, the court placed substantial weight on improper factors.  The court placed substantial weight on the Defendant's previous romantic relationships and determined that the Defendant had a "long history" of criminal conduct based upon his nontraditional, but lawful, relationships and upon the unproven conduct the court erroneously concluded was criminal conduct.  As we have previously determined, insufficient evidence was presented to establish that the Defendant committed statutory rape when he was age eighteen.  In any event, we do not view two incidents separated by twenty-five years and in different contexts as constituting a long history of criminal conduct for purposes of denying alternative sentencing.   The record does not reflect that the Defendant had a long history of criminal conduct.

Again, no psychosexual evaluation was conducted in this case.  Tennessee Code Annotated section 39-13-705(a) states, "[E]ach sex offender who is to be considered for probation or any other alternative sentencing *shall* be required to submit to an evaluation for treatment, risk potential, procedures required for monitoring of behavior to protect victims and potential victims" (emphasis added).  *See State v. Freddie McCullough*, No. W2006-01407-CCA-R3-CD, 2007 WL 2376328, at n.5 (Tenn. Crim. App. Aug. 20, 2007) (stating that in the absence of a completed psychosexual evaluation, the sentencing hearing should not have been conducted).  We note that the record reflects no discussion about obtaining an evaluation in this case.  Before a new sentencing hearing is held, the Defendant should undergo the statutorily required psychosexual evaluation.   A psychosexual evaluation is extremely relevant to the trial court's determining that the Defendant posed a risk to B.D., a factor upon which the court placed significant emphasis in denying alternative sentencing.

## III

### Sex Offender Registry

The Defendant contends that the trial court erred by requiring him to register as a sex offender, arguing that the order was made "as an afterthought," that no psychosexual

evaluation was conducted, and that the court did not properly consider the factors articulated in Tennessee Code Annotated section 39-13-506(d)(2)(B) (2014), which governs sex offender registration in the context of statutory rape. The Defendant further argues that the length of time he will be required to register is "vague and ambiguous." The State responds that the court did not abuse its discretion and that it is "reasonable to assume" that the court's prior findings of fact informed its decision to place the Defendant on the sex offender registry.

Tennessee Code Annotated section 39-13-506(d)(2)(B) states that

> In addition to the punishment provided for a person who commits statutory rape for the first time, the trial judge may order, after taking into account the facts and circumstances surrounding the offense, including the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement, that the person be required to register as a sexual offender[.]

The record reflects that after the trial court ordered full confinement, a discussion occurred between the court, the prosecutor, defense counsel, and a probation officer relative to whether the court could limit the term of registration. Although the court discussed the circumstances of the offense and the plea agreement in the context of alternative sentencing and diversion, it did not place on the record its reasoning for ordering the Defendant to register as a sex offender. The court briefly noted for counsel that the court did not think the Defendant had agreed to a longer sentence than he faced at trial, but the court did not otherwise discuss the plea agreement.

The State's argument relative to the trial court's prior findings of fact is flawed because the court's findings relative to alternative sentencing were based upon erroneous determinations and improper factors. It is also not the province of this court to assume a trial court's reasoning. Because we remand for a new sentencing hearing, we need not belabor the issue, but if after the new hearing the court determines that the Defendant should be ordered to register as a sex offender, it should place proper findings on the record to support its determination.

Relative to the Defendant's argument about the length of registration, we note that a trial court does not determine the length of time a defendant must remain on the sex offender registry. Ten years after the Defendant's sentence is completed, he may file a request with the Tennessee Bureau of Investigation for removal from the registry. *See* T.C.A. § 40-39-207(a)(1) (Supp. 2011) (amended 2014, 2015) ("No sooner than ten (10) years after termination of active supervision on probation, parole or any other alternative to incarceration, or . . . after discharge from incarceration without supervision, an offender required to register under this part may file a request for termination of registration requirements[.]"). The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's conviction, but we remand the case to the trial court for a psychosexual evaluation and a new sentencing hearing to determine the Defendant's suitability for diversion or alternative sentencing and whether the Defendant should be required to register as a sex offender.

_____
ROBERT H. MONTGOMERY, JR., JUDGE